## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TELISA CLARK, LAKESHIA BARNETT, CRESCENT CITY MEDIA GROUP, and LEAGUE OF WOMEN VOTERS LOUISIANA,<br><br>    Plaintiffs,<br><br>v.<br><br>JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana; KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana; JEFF LANDRY, in his official capacity as Attorney General of the State of Louisiana,<br><br>    Defendants. | Case No.: 3:20-cv-00308-SDD-RLB |
| POWER COALITION FOR EQUITY AND JUSTICE, et al.<br><br> Plaintiffs,<br><br>v.<br><br>JOHN BEL EDWARDS, et al.,<br><br>    Defendants. | Case No.: 3:20-cv-00283-SDD-RLB |

## *CLARK* PLAINTIFFS' FIRST AMENDED COMPLAINT

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs Telisa Clark, Lakeshia Barnett, Crescent City Media Group, and League of Women Voters Louisiana (collectively, "Plaintiffs") bring this action for immediate injunctive and declaratory relief against Louisiana Governor John Bel Edwards, Secretary of State Kyle Ardoin, and Attorney General Jeff Landry, for failing to protect the fundamental right to vote

ahead of the 2020 elections—including elections on July 11, August 15, November 3, and December 5—during Louisiana's COVID-19 public health crisis.

2.      The COVID-19 pandemic presents an unprecedented challenge to our nation, threatening the lives, livelihood, and health of millions of Americans and severely straining health care systems, the economy, and all levels and branches of government.

3.      COVID-19 is wreaking havoc across all sectors and causing massive disruptions in election administration during this presidential election year. With its high transmission and mortality rates, COVID-19 poses a significant risk to in-person voters, especially to those voters at higher risk of severe complications from COVID-19. The pandemic has decimated voter registration drive activity, makes it unreasonably dangerous and burdensome to comply with certain requirements for mail-in absentee voting, and threatens massive withdrawals by volunteer poll workers who justifiably fear contracting the disease.

4.      The United States has recorded more than 2.1 million confirmed cases and 111,140 deaths.[1] As of June 16, 2020, Louisiana had reported 47,706 cases and 2,930 deaths.[2]

5.      In the face of this rapidly escalating public health emergency, Defendant Governor Edwards declared a state of emergency[3] and issued a stay-at-home order.[4] He also twice postponed the primary and municipal elections,[5] and later extended the state's stay-at-home order to May

---

[1] Ctrs. for Disease Control & Prevention (CDC), *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html#accordion-1-collapse-3 (last updated June 17, 2020).

[2] *Louisiana Coronavirus (COVID-19) Information,* La. Dept. of Health, http://ldh.la.gov/coronavirus/ (last updated June 17, 2020).

[3] Proclamation No. 25 JBE 2020, § 1, https://gov.louisiana.gov/assets/Proclamations/2020/modified/25-JBE-2020-Public-Health-Emergency-COVID-19.pdf.

[4] Proclamation No. 33 JBE 2020, § 3, https://gov.louisiana.gov/assets/Proclamations/2020/modified/33-JBE-2020-Public-Health-Emergency-COVID.pdf.

[5] Proclamation No. 28 JBE 2020 (Mar. 13, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/28-JBE-2020-Special-Elections-COVID19-Postponement.pdf; Proclamation No. 46 JBE 2020 (Apr. 14, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/46-JBE-2020-Elections.pdf.

15.[6] Even with the stay-at-home order partially lifted as of May 15, Louisianans are still required to stay at home as much as possible; the types of businesses allowed to open may only do so with strict social distancing, required mask use for employees helping the public, and only at 25 percent total occupancy.[7]

6.      On April 15, 2020, Defendant Secretary of State Ardoin proposed an emergency election plan that would have substantially reduced the risk of voters being exposed to COVID-19 by suspending certain aspects of Louisiana election law that require person-to-person interactions, including in-person voting by large categories of individuals. In declaring his support for Secretary Ardoin's plan, Defendant Governor Edwards stated that "nobody should have to choose between exercising their right to vote and potentially endangering themselves or others."[8]

7.      Secretary Ardoin's original plan was blocked by the Louisiana legislature. Instead, on April 27, 2020, the Legislature adopted an alternative emergency election plan for the July 11 Presidential Preference Primary and Municipal Primary Election ("July election") and the August 15 Municipal General Election ("August election"), developed and submitted by Defendants Governor Edwards and Secretary of State Ardoin (the "Emergency Election Plan").[9] As described herein, the alternative Emergency Election Plan failed to suspend a number of aspects of Louisiana election law that will unnecessarily expose voters to risk of contracting COVID-19 and place an undue burden on the right to vote. The Emergency Election Plan also does not apply to the

---

[6] Proclamation No. 52 JBE 2020, § 15, https://gov.louisiana.gov/assets/Proclamations/2020/52-JBE-2020-Stay-at-Home-Order.pdf.
[7] Proclamation No. 58 JBE 2020, § 15 (May 14, 2020) § 2A, 2C, 2D, https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf.
[8] Id.
[9] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana, Sec'y of State (Apr. 20, 2020), https://www.sos.la.gov/OurOffice/PublishedDocuments/Revised%20Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-20.pdf.

November 3 Presidential General and Open Congressional Primary Election ("November election") or the December 5 Congressional and Open General Election ("December election").[10]

8.      Louisiana law limits absentee voting by mail to voters who satisfy one of fifteen excuses ("Excuse Requirement"). *See* La. Rev. Stat. § 18:1303. The Emergency Election Plan creates an additional COVID-19 emergency absentee ballot application, which extends the ability to vote by mail to five narrow categories of voters with COVID-19–related restrictions.[11] The Emergency Election Plan fails to protect other categories of voters who need protection from COVID-19.

9.      The Emergency Election Plan leaves in place the requirement that voters who cast their ballots by mail find a witness to observe the signing of their absentee ballot affidavit and then sign the certificate envelope (the "Witness Requirement"). *See* La. Rev. Stat. § 18:1306(E.)(2)(a). On June 11, 2020, Defendant Governor Edwards signed Senate Bill 75 ("SB 75") into law, effective immediately, that amended the Witness Requirement to require that no person, except the immediate family member of the absentee voter, can witness more than one absentee ballot. ABSENTEE VOTING, 2020 La. Sess. Law Serv. Act 210. The Witness Requirement will require voters who qualify to vote by mail and who live on their own to risk infection to have their ballots counted.

10.      Louisiana law fails to provide absentee voters with notice of defects with their mail-in absentee ballot requests and their mail-in absentee ballots and deprives them of an opportunity to cure such problems so that their votes may be counted ("Cure Prohibition"). *See* La. Rev. Stat.

---

[10] *See id.* at 2.
[11] Emergency Election Plan, *supra* note 9, at 8.

§ 18:1313.[12] Louisiana also provides no mechanism for tracking whether one's absentee ballot has been received, accepted, or counted.

11.    Epidemiologists and infectious disease specialists have already concluded that there will very likely be a COVID-19 resurgence in the United States this fall. Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, has said a second wave of infections in the United States is "inevitable."[13] Furthermore, experts from the Harvard T.H. Chan School of Public Health's Center for Communicable Disease Dynamics warned that, to avoid exceeding hospital critical care capacities, prolonged or intermittent social distancing may be necessary into 2022.[14]

12.    The Excuse Requirement, Witness Requirement, and Cure Prohibition (collectively, the "Challenged Provisions") will unnecessarily deprive Louisiana voters of their right to vote in 2020 elections in light of COVID-19.

13.    Both together and separately, the Excuse Requirement and the Witness Requirement needlessly burden Louisiana voters' fundamental right to vote in the 2020 elections in light of COVID-19. The Excuse Requirement and the Witness Requirement directly contradict the specific guidance from the Centers for Disease Control and Prevention ("CDC") concerning safe voting practices during the COVID-19 pandemic. Among other measures, the CDC

---

[12] As explained *infra*, on June 15, 2020, Defendant Secretary of State Ardoin, with the approval of Defendant Attorney General Landry as required by La. Rev. Stat. § 18:18 (A)(3), promulgated an emergency rule that purports to provide an opportunity for voters to be notified of and have an opportunity to cure certain procedural deficiencies in their absentee ballots. *See* ECF No. 40, 40-1. The process requires, however, that the voter appear in person at the office of the registrar, regardless of the deficiency. *See id.*

[13] *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, White House (Mar. 25, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-11/.

[14] Stephen M. Kissler et al., *Projecting the transmission dynamics of SARS-CoV-2 through the postpandemic period*, Science, Apr. 14, 2020, https://science.sciencemag.org/content/early/2020/04/24/science.abb5793.

recommends that states and jurisdictions "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations."[15]

14.    The Excuse Requirement and the Witness Requirement create significant risks to the health and lives of Plaintiffs, as well as the Organizational Plaintiffs' members and thousands of other Louisiana voters who want to vote in the July, August, November, and/or December 2020 elections.

15.    The risk of disenfranchisement from the Excuse Requirement and Witness Requirement fall more heavily on Black citizens in Louisiana, who are more likely than white Louisianans to live alone or with young children, more likely to have underlying health conditions that put them at severe risk from COVID-19, and who are afflicted by and die from COVID-19 at shockingly disproportionate rates. Black Louisianans comprise nearly 57% of COVID-19–related deaths despite making up just 33% of the state's total population. Black Louisianans are also more likely to live alone, making the Witness Requirement more burdensome than for white Louisianans. Louisiana's history of racial discrimination in various areas, such as voting, education, employment, and healthcare, interact with these provisions to hinder Black people's ability to participate effectively in the political process in violation of Section 2 of the Voting Rights Act.

16.    The Excuse Requirement and the Witness Requirement, separately and together, unduly burden the fundamental right to vote of Louisiana voters for the 2020 elections.

---

[15] Ctrs. for Disease Control & Prevention, *Recommendations for Election Polling Locations: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated March 27, 2020).

17.     The Excuse Requirement and the Witness Requirement, separately and together, violate Louisiana voters' fundamental right to bodily integrity by requiring them to take a severe risk to their health in order to exercise their right to vote.

18.     The Cure Prohibition will deprive Louisiana voters of their liberty interests in requesting and casting mail-in absentee ballots and exercising their fundamental right to vote by denying them notice of and an opportunity to cure defects.

19.     Plaintiffs therefore ask the Court to enjoin the Challenged Provisions and declare them unconstitutional for the duration of the 2020 election cycle. Given that epidemiologists and infectious disease specialists, including Dr. Anthony Fauci, are predicting a highly likely resurgence of COVID-19 in the fall, and given the inexorable timeline of election administration procedures that must be completed to print mail-in ballots with certificate envelopes and instructions and to educate the electorate about revised voting procedures, Plaintiffs, who all seek to vote in November, must be granted relief now.

## II.     <u>JURISDICTION AND VENUE</u>

20.     This action arises under the First and Fourteenth Amendments to the U.S. Constitution, as well as Section 2 of the Voting Rights Act ("VRA"), and is brought under 42 U.S.C. §§ 1983 and 1988 and authorized under 52 U.S.C. § 10302 to seek injunctive and declaratory relief for violations of constitutional and statutory rights under color of state law. This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

21.     This Court has personal jurisdiction over Defendants because each is sued in their official capacity as a state official, and the violations complained of concern their conduct in such capacities.

22.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

23.     Venue in the Middle District of Louisiana is proper based on 28 U.S.C. § 1391(b)(1) because Defendants are state officials working in Baton Rouge, Louisiana.

### III.    PARTIES

24.     Plaintiff TELISA CLARK is a 55-year-old event planner and civil rights activist. She is a U.S. citizen, has never lost her right to vote by reason of a felony conviction or court order, and is a registered voter in Louisiana. She is African-American and lives in Houma, Louisiana. Ms. Clark lives at home with her husband, Kevin Clark, who is 58 years old. Several family members live with Ms. Clark and her husband at their home. Ms. Clark, her husband, and many members of her household have health conditions that put them at higher risk of contracting and suffering severe complications and potentially dying from COVID-19. Ms. Clark has hypertension and other serious heart conditions. Her husband is currently undergoing treatment for lung cancer and is at extremely high risk of severe complications from COVID-19. Ms. Clark's daughter Kevon Barnett is currently seven months pregnant and suffers from hypertension. And Ms. Clark's grandson Matthew, who is 18 and a registered voter, has severe asthma. Because of the risk COVID-19 poses to their health, Ms. Clark, her husband, her daughter Kevon, her grandson Matthew, and other family members have been limiting their outside activity and avoiding person-to-person contact. When they must go out in public, Ms. Clark and her husband wear gloves, masks, and coverings on their clothes. Both Ms. Clark and her husband are lifelong, regular voters. Ms. Clark prefers to vote in-person on election day. She voted early in-person recently after her husband was diagnosed with cancer. Ms. Clark plans to vote in the July, August, November, and December elections in Houma. Because of the severe risk that voting in person at her polling place or at an early voting site poses to her health, her husband's health, and the health of family members living in her household, Ms. Clark needs to vote by absentee ballot for all upcoming

2020 elections. Ms. Clark understands that for the July and August elections, she will qualify to request an absentee ballot through the COVID-19 Emergency Application as someone at higher risk of severe illness from COVID-19 due to serious underlying medical conditions as identified by the CDC. Ms. Clark understands, however, that for the November and December elections, she does not qualify to request an absentee ballot and must choose between voting in person—risking her health and the health of her family—and not voting at all.

25.    Plaintiff LAKESHIA BARNETT is 26 years old, a U.S. citizen, has never lost her right to vote by reason of a felony conviction or court order, and is a registered voter in Louisiana. She is African-American and lives in Houma, Louisiana. Ms. Barnett lives with her parents, Telisa and Kevin Clark, and several other family members, at her parents' home. Many of her family members in her home—including her parents—suffer from health conditions that put them at higher risk of contracting and suffering severe complications and dying from COVID-19. Ms. Clark has hypertension and other serious heart conditions. Mr. Clark is currently undergoing treatment for lung cancer and is at extremely high risk of severe complications from COVID-19. Ms. Barnett's sister Kevon Barnett is currently seven months pregnant and suffers from hypertension. And Ms. Barnett's nephew Matthew, who is 18 and a registered voter, has severe asthma. Because of the risk COVID-19 poses to their health, Ms. Barnett, her parents, sister, nephew, and other family members have been limiting their outside activity and avoiding person-to-person contact except when necessary. Ms. Barnett currently works two jobs. One employer, Target, recently reduced her hours to zero, and she has not worked there since late April. She also works at the U.S. Postal Service. At her job, Ms. Barnett rarely interacts with members of the public and always wears protective gear. Ms. Barnett relies on her job to pay her living expenses and for health insurance. At this job, she does not have the option to work from home or take time

off because she is worried about infecting her family members who are at higher risk from COVID-19. If she took too much time off from work, she would lose her job. Ms. Barnett registered to vote when she turned 18 and has voted regularly since then. She intends to vote in each election in 2020. She prefers to vote in person, but because of the risks voting in person would pose to her family, Ms. Barnett needs to vote by absentee ballot in the July, August, November, and December elections. Ms. Barnett understands that she needs an excuse to qualify for an absentee ballot in Louisiana and that she does not qualify for any excuse under Louisiana law. Therefore, if Ms. Barnett wants to vote in any election in 2020, she understands that she would have to vote in person, which would require her to engage in the person-to-person contact she has been avoiding to protect the health of her high-risk family members. If forced to vote in person, Ms. Barnett would have to choose between her vote and her family's health.

26.    Plaintiff CRESCENT CITY MEDIA GROUP ("CCMG") is a community engagement and media production agency based in New Orleans, Louisiana. CCMG was founded to address disparities in civic engagement and political education in communities of color in Louisiana. CCMG works on a wide range of projects including civic engagement trainings, voter registration campaigns, census education, mutual aid and direct service, and voter education.

27.    CCMG leads the "Louisiana Counts 2020" complete count committee and began preparations for this public education campaign in 2018. CCMG prepared and disseminated media toolkits, organizer trainings, social media campaigns, factual reports, and other resources for community stakeholders across Louisiana to use in their census education work. CCMG also invested significant time and energy into developing their "Census and Redistricting Initiative," a community education initiative focused on preparing communities for the 2020 Census and 2021 redistricting cycle. The program would have taught Louisiana residents the basics of the

redistricting process. In addition to its specific census and redistricting work, CCMG conducts various voter education and policy advocacy training programs such as the Democracy and Power Institute, which was founded in 2016 and teaches students and community leaders how to draft legislation and lobby local governments.

28.    Much of CCMG's planned work has been put on hold as it must now expend its limited resources to respond to the state's Emergency Election Plan and preparing for the upcoming 2020 elections, in which thousands of voters of color will be forced to risk their health by voting in person at their polling place. CCMG is now using its limited resources to acquire and produce masks and other personal protective materials to provide to voters who will be forced to cast a ballot in person this year because they do not qualify for an absentee ballot under the Excuse Requirement. During early voting and on election day, CCMG will provide direct support at polling places by handing out hand sanitizer and information on social distancing. CCMG is also now educating voters about the Emergency Election Plan, explaining and training voters on the Excuse Requirement, including the COVID-19 emergency absentee ballot application. CCMG will be helping voters navigate the absentee ballot process, including the Witness Requirement for voters who live alone by doing radio and television public service announcements about what voters can do to protect themselves from COVID-19 infection while complying with the Witness Requirement. The resources and staff time spent on these activities would have been spent on CCMG's community education activities relating to the Census, voter registration drivers, and redistricting. But for the Challenged Provisions, CCMG would otherwise be spending these resources, time, and staff hours on its core mission activities.

29.    Plaintiff LEAGUE OF WOMEN VOTERS LOUISIANA ("LWVLA") is the Louisiana affiliate of the national League of Women Voters (the "LWVUS"). LWVLA is a

nonpartisan, not-for-profit corporation organized under the laws of Louisiana. The mission of LWVLA is to be a recognized, trusted, and knowledgeable volunteer, grassroots community resource with the flexibility and sustainable capacity to ensure a strong, active, and participatory democracy for all persons. The LWVLA is dedicated to ensuring that all eligible voters— particularly those from traditionally underrepresented or underserved communities, including first-time voters, non-college youth, new citizens, minorities, the elderly, and low-income Americans— have the opportunity and the information to exercise their right to vote. The local Leagues are active in voter registration, especially of new citizens and high school and college youths, while the state League works with the Secretary of State's office to increase voter participation in elections.

30.     Because of the restrictions on absentee ballots under Louisiana law during the COVID-19 pandemic, LWVLA has been forced to divert time and resources away from its regular activities. Specifically, LWVLA will be conducting public education on the passage of the Emergency Election Plan with its complicated and vague Excuse Requirement, the current absentee ballot laws—including the Witness Requirement—and how voters can stay safe while complying with the law and voting. LWVLA member volunteers will be sending newsletters, writing letters to the editor, engaging in voter outreach, responding to voter contacts, and conducting voter education events to ensure that members and the Louisiana electorate are educated on how they can vote during the 2020 elections without endangering their health or the health of their loved ones or the community. Because the LWVLA has limited financial and human resources, the resources and member time they will have to spend on these efforts would have been spent on the following LWVLA efforts: voter registration efforts, education around the 2020 Census and redistricting, and "Get Out the Vote" efforts during the 2020 election cycle.

31.     The LWVLA has six local Leagues across the state and 287 members and members-at-large. Many of the members of the LWVLA are over the age of 60. Some of its members live in senior living facilities. Many members include registered voters age 60-65 who are at higher risk for contracting and suffering severe complications or dying from COVID-19. Voting in person would therefore put the health of these voters at significant risk because of the person-to-person contact at the polling place. But these members do not currently qualify for an absentee ballot under Louisiana law or the Emergency Election Plan.

32.     LWVLA members include registered voters who live with, care for, or come into regular contact with loved ones who are at higher risk of contracting and suffering severe complications—including death—from COVID-19; yet, these members do not currently qualify for an absentee ballot under Louisiana law or the Emergency Election Plan. These members must choose between their vote and risking the health of their loved one by voting in-person at their polling place.

33.     Defendant John Bel Edwards is the Governor of Louisiana and is being sued in his official capacity. Under the Louisiana Constitution, he is "the chief executive officer of the state," and must "faithfully support the constitution and laws of the state and of the United States," as well as ensure that "the laws are faithfully executed." La. Const. art. IV, § 5(A). Defendant Governor Edwards is required to uphold the U.S. Constitution, including the First and Fourteenth Amendments, as part of the execution of his gubernatorial duties and responsibilities. 4 U.S.C. § 101. In his capacity as "chief executive officer of the state," Defendant Governor Edwards is empowered to suspend or delay "any qualifying of candidates, early voting, or elections" "upon issuance of an executive order declaring a state of emergency or impending emergency." *Id.* § 18:401.1. The Governor does so "upon the certification of the secretary of state that a state of

emergency exists. *Id.* Defendant Governor Edwards is also responsible for approving, along with a majority of the Senate Committee on Senate and Governmental Affairs and House Committee on House and Governmental Affairs, an Emergency Election Plan submitted by the Secretary of State "for the holding of elections impaired as a result of such an emergency or disaster." *Id.* § 18:401.3.

34.    Defendant Kyle Ardoin is the Secretary of State of Louisiana, and he is sued in his official capacity. The Secretary of State is the state's chief election officer. LA Const. art. IV, § 7. In that capacity, he is responsible for, among other things, administering election laws, preparing and certifying the ballots for all elections, and promulgating all election returns. *Id.* The Secretary of State is also responsible for preparing absentee by mail ballots, envelopes, instructions, certificates, and "all other matters pertaining to absentee by mail and early voting ballots shall be determined by the Secretary of State, subject to approval as to content by the attorney general." La. Rev. Stat. § 18:1306(A)(1); *see also id* § 18:1306(B)(1).

35.    Defendant Jeff Landry is Louisiana's Attorney General and is being sued in his official capacity. As Attorney General, Defendant Landry is the "chief legal officer of the state," charged with asserting or protecting the rights or interests of Louisiana. La. Const. art. IV, § 8. Defendant Landry is empowered to approve the content of various materials related to absentee ballots. La. Rev. Stat. § 18:1306(A)(1); *see also id* § 18:1306(B)(2). Like other executive officers of the State, Defendant Attorney General Landry is required to support the U.S. Constitution, including the First and Fourteenth Amendments to it, before executing his duties as Attorney General. 4 U.S.C. § 101.

# IV.    STATEMENT OF FACTS

## A.  Transmission of COVID-19 and Public Health Guidelines

36.    In December 2019, a novel coronavirus was detected, now named SARS-CoV-2, and the disease it causes became known as COVID-19; it has now spread throughout the world, including to every state in the United States.

37.    On January 30, 2020, the World Health Organization (WHO) declared COVID-19 to be a Public Health Emergency of International Concern. On March 11, 2020, the WHO declared that it had become a pandemic. On March 13, 2020, President Donald Trump proclaimed a National Emergency concerning COVID-19.

38.    On March 11, 2020, Defendant Governor Edwards declared a state of emergency,[16] and issued a stay at home order[17] on March 22, which was revised on May 15.[18] He has also twice postposed the presidential preference primary and municipal elections as a result of the COVID-19 pandemic.[19]

39.    The novel coronavirus that causes COVID-19 continues to spread at an unprecedented pace around the world and within the United States. There are currently 2.1 million confirmed cases in the United States, and there have been 116,140 deaths nationwide.

40.    COVID-19 is highly contagious and lethal. According to an article published in *Science Magazine*, produced by the American Association for the Advancement of Science, "the virus acts like no pathogen humanity has ever seen."[20]

---

[16] Proclamation No. 25 JBE 2020, § 1.
[17] Proclamation No. 33 JBE 2020, § 3.
[18] Proclamation No. 58 JBE 2020, § 15 (May 14, 2020) § 2A, 2C, 2D, https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf.
[19] Ashley Dean, *Louisiana's Elections Are Postponed Another 3 Weeks*, New Orleans Public Radio, Apr. 14, 2020, https://www.wwno.org/post/louisianas-elections-are-postponed-another-3-weeks.
[20] Meredith Wadman et al., *How does coronavirus kill? Clinicians trace a ferocious rampage through the body, from brain to toes*, Science Magazine, Apr. 17, 2020, https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes#.

41.    According to the Centers for Disease Control and Prevention ("CDC"), older adults and those who have underlying health conditions and diseases, such as chronic lung diseases, moderate to severe asthma, diabetes, serious heart conditions, and others that suppress immune systems like HIV/AIDS, are at higher risk of complications from COVID-19.[21] The CDC's website, relying upon research from the National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases, notes that immunocompromised individuals are at severe risk from COVID-19: "Many conditions can cause a person to be immunocompromised, including cancer treatment, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications."[22] Severe COVID-19 cases can lead to pneumonia and acute respiratory distress syndrome, requiring hospitalization; in critical cases, some patients need to be intubated and put on a ventilator.

42.    Younger people have also contracted severe cases of COVID-19 and been hospitalized; many of them have died. In Louisiana, patients under the age of 50 have accounted for about six percent of COVID-19 related deaths in the state,[23] a rate far higher than in New York and New Jersey,[24] even though these states have seen approximately nine times and four times the number of deaths as Louisiana, respectively. As of May 9, 2020, about 30 percent of all

---

[21] Ctrs. For Disease Control & Prevention, *People who are at higher risk for severe illness*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated May 14, 2020).

[22] Ctrs. for Disease Control & Prevention, *Information for Healthcare Professionals: COVID-19 and Underlying Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (last updated Apr. 6, 2020).

[23] La. Dept. of Health, Louisiana Coronavirus (COVID-19) Information, Cases/Deaths by Age Group, http://ldh.la.gov/coronavirus/ (last updated May 19, 2020).

[24] N.Y. St. Dept. of Elections, Fatalities, Fatalities by Age Group, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (last updated May 19, 2020); State of New Jersey Dept. of Health, COVID-19 Deaths by Age Group, New Jersey COVID-19 Dashboard, https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (last updated May 19, 2020).

hospitalizations from COVID-19 in the United States have been of people less than 50 years old.[25] Young, healthy Americans have suffered debilitating and even, in certain cases, fatal strokes from COVID-19, underscoring how little is known about how this particular virus actually attacks the human body. Finally, and significantly, even if a person ultimately recovers from COVID-19, it may leave their lungs and other organs severely damaged or weakened, leading to lifelong respiratory deficiencies or problems.[26]

43.     The CDC has noted that asymptomatic COVID-19-positive individuals can transmit the disease to others.[27] As a result, the disease can spread before individuals know that they have contracted COVID-19, facilitating the rapid contagion.

44.     Louisiana has been especially hard-hit by COVID-19, experiencing the fastest two-week spread of COVID-19 compared to other U.S. states and other countries.[28] As of June 17, 2020, Louisiana reported 47,706 COVID-19 cases and 2,930 deaths.[29] Louisiana ranks ninth in the nation in the number of deaths, and it has lost more residents to COVID-19 than more populous states like Texas, Florida, Georgia, Washington, and Maryland.[30]

## B. Louisiana's Elections During the COVID-19 Pandemic

45.     COVID-19 will have an unprecedented impact on the nation's upcoming elections. Before the COVID-19 pandemic, the Brookings Institution predicted that "turnout in 2020 could

---

[25] COVID-19 Laboratory-Confirmed Hospitalizations, COVID-19 Associated Hospitalizations by Age, https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html (last updated Apr. 25, 2020).
[26] Robin Young & Samantha Raphelson, *As Patients Recover From Coronavirus, Doctors Wonder About Long-Term Health Impacts*, WBUR, Apr. 28, 2020, https://www.wbur.org/hereandnow/2020/04/28/coronavirus-recovery-challenges.
[27] Ctrs. For Disease Control & Prevention, *Coronavirus 2019 (COVID-19): How to Prepare*, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last updated Mar. 4, 2020).
[28] Andrew Capps, *Louisiana experiences fastest COVID-19 case increase in the world in first weeks*, Lafayette Daily Advertiser, Mar. 24, 2020, https://www.theadvertiser.com/story/news/local/2020/03/24/covid-19-cases-louisiana-coronavirus-spreading-faster-than-anywhere-world/2907504001/.
[29] *Louisiana Coronavirus (COVID-19) Information,* La. Dept. of Health, http://ldh.la.gov/coronavirus/ (last updated June 17, 2020).
[30] CDC, *Cases in U.S.*, *supra* note 1.

break all records and test our election machinery as it has never been tested before."[31] Other experts also anticipate record-breaking turnout in the 2020 presidential election.[32] Louisiana's own turnout statistics reflect voters' increasing participation and interest. The 2019 gubernatorial election saw a turnout of 51.05 percent,[33] compared to 40.19 percent in 2015.[34] In the 2016 general election, over 67.79 percent of registered voters cast a ballot.[35]

46.    On April 15, 2020, Defendant Secretary of State Ardoin proposed an emergency election plan that would have expanded access to absentee ballots during the July primary and August municipal elections, pursuant to La. Rev. Stat. § 18:401.3. Specifically, the first emergency plan expanded the reasons to request an absentee ballot to registered voters who are:

- Sixty years of age or older;

- At higher risk of severe illness from COVID-19 due to serious underlying medical conditions (such as chronic lung disease, moderate to severe asthma, hypertension and other serious heart conditions, diabetes, undergoing chemotherapy, immunodeficiencies, severe obesity, chronic kidney disease and undergoing dialysis, and liver disease);

- Subject to a stay-at-home, quarantine, or isolation order;

- Advised by a health care provider or governmental authority to self-quarantine due to COVID-19 concerns;

- Experiencing symptoms of COVID-19 and seeking a medical diagnosis;

---

[31] William A. Galston, *What does high voter turnout tell us about the 2020 elections?* Brookings Institution (Nov. 20, 2019), https://www.brookings.edu/blog/fixgov/2019/11/20/what-does-high-voter-turnout-tell-us-about-the-2020-elections/.

[32] *See, e.g.*, Susan Milligan, *Preparing for a Voter Surge*, U.S. News & World Report, Sept. 20, 2019, https://www.usnews.com/news/elections/articles/2019-09-20/experts-predict-huge-turnout-in-2020; Nate Cohn, *Huge Turnout Is Expected in 2020. So Which Party Would Benefit?* N.Y. Times, July 15, 2019, https://www.nytimes.com/2019/07/15/upshot/2020-election-turnout-analysis.html; Ronald Brownstein, Brace for a Voter-Turnout Tsunami, The Atlantic, June 13, 2019, https://www.theatlantic.com/politics/archive/2019/06/2020-election-voter-turnout-could-be-record-breaking/591607/.

[33] *State Wide Post Election Statistical Report*, La. Sec'y of State 1 (Nov. 16, 2019), https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2019_1116_sta.pdf.

[34] *State Wide Post Election Statistical Report,* La. Sec'y of State 1 (Nov. 21, 2015), https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2015_1121_sta.pdf.

[35] *State Wide Post Election Statistical Report*, La. Sec'y of State 1 (Nov. 8, 2016), https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2016_1108_sta.pdf.

- Unable to appear in public due to concern of exposure to or transmission of COVID-19;

- Caring for an individual who is subject to a stay-at-home, quarantine, or isolation order or who has been advised by a health care provider or governmental authority to self-quarantine due to COVID-19 concerns; or

- Caring for a child or grandchild if the child's school or daycare is closed, or the childcare provider is unavailable, due to precautions taken because of COVID-19 concerns.

47.    The first proposed emergency election plan also stated that failure to comply with the Witness Requirement would not be a reason to challenge or reject returned absentee ballots for the July and August elections.

48.    The plan was blocked by the Louisiana Senate and Governmental Affairs Committee, which cited concerns of "voter fraud."[36] After the first emergency election plan was blocked, Defendant Governor Edwards stated that "nobody should have to choose between exercising their right to vote and potentially endangering themselves or others."[37] To the senators' concerns about Louisiana voters using the COVID-19 crisis to engage in fraudulent behavior, Defendant Secretary of State Ardoin stated: "I think some of their concerns are not steeped in all the facts that were presented to them today. I'm hoping over time there can be some clarity."[38]

49.    On April 20, Defendant Secretary of State Ardoin presented a substantially revised emergency election plan. Unlike the initial proposal, the revised Emergency Election Plan included far fewer categories of voters eligible to cast absentee ballots and failed to waive the Witness Requirement for absentee ballots during the July and August elections. The Emergency Election

---

[36] Sam Karlin, *Louisiana republicans block emergency coronavirus election plan; future of election unclear*, The Advocate, Apr. 15, 2020, https://www.theadvocate.com/baton_rouge/news/coronavirus/article_4dfccfd6-7f44-11ea-b67e-73d2172ba20b.html.
[37] *Id.*
[38] *Id.*

Plan forces voters to choose between exercising their right to vote and potentially endangering themselves or others.

50.    The Emergency Election Plan was approved, ironically, by the Louisiana legislature *mailing* in their votes.[39]

51.    Defendant Secretary of State Ardoin is now implementing the Emergency Election Plan. There is no emergency election plan in place for the November or December elections.

52.    Even with the Emergency Election Plan in place, several provisions of Louisiana law, as well as the Emergency Election Plan itself, now pose direct and severe obstacles to voting in Louisiana's 2020 elections and having one's vote counted. These provisions are: (1) the Excuse Requirement: the requirement to satisfy a specific excuse on the COVID-19 emergency application for absentee ballots, provided in the Emergency Election Plan passed pursuant to La. Rev. Stat. § 18:401.3 and the requirement to satisfy a specific excuse to vote by absentee ballot, as provided in La. Rev. Stat. § 18:1303(B); (2) the Witness Requirement: the requirement that voters obtain a witness signature on their mail-in absentee ballot that is either an immediate family member or a person who has not witnessed any other absentee ballot, pursuant to La. Stat. Rev. § 18:1306(E)(2)(a)[40]; and (3) the Cure Prohibition: the failure to provide absentee voters with notice of defects with their absentee ballot request forms or their mail-in absentee ballots and an opportunity to cure such problems so that their votes may be counted.

53.    According to Louisiana law, the following categories of voters may vote by mail:

- Members of the United States Service, their spouses, and dependents;

---

[39] Tierney Sneed, *The Irony: LA Legislature Votes By Mail To Approve Plan Limiting Vote-By-Mail*, TPM, May 4, 2020, https://talkingpointsmemo.com/news/voting-rights-primer-pandemic-age-flashpoint-voting.

[40] As noted above, on June 11, 2020, Defendant Governor Edwards signed into law Senate Bill 75 ("SB 75"), which amended the Witness Requirement to require that "No person except the immediate family member of the voter, as defined in this Code, shall witness more than one certificate of a voter." ABSENTEE VOTING, 2020 La. Sess. Law Serv. Act 210. The law became effective immediately. *Id.*

- Students, instructors, or professors at institutions located outside their parish of residence, their spouses, and dependents;

- Ministers, priests, rabbis, or other members of the clergy assigned to a religious post outside their parish of registration, their spouses, and dependents;

- Those who will be or expect to be outside their parish of registration during the early voting period and on Election Day;

- Those involuntarily confined to a mental health institution;

- Voters located outside the United States;

- Jurors sequestered on Election Day;

- Voters hospitalized during the early voting period and on Election Day;

- Those employed on state waters during the early voting period and on Election Day;

- Incarcerated voters not confined pursuant to a felony conviction;

- Participants in the Department of State Address Confidentiality Program;

- Voters with disabilities;

- Voters aged sixty-five years and older;

- The Secretary of State and his or her employees; and

- People employed by a registrar of voters outside of their parish of registration.

*See* La. Rev. Stat. § 18:1303.

54.     The Emergency Election Plan extends the ability to vote by mail to voters:

- At higher risk of severe illness from COVID-19 due to serious underlying medical conditions as identified by the Centers for Disease Control and Prevention (including chronic lung disease, moderate to severe asthma, serious heart conditions, diabetes, severe obesity (BMI of 40 or higher), chronic kidney disease and undergoing dialysis, liver disease, pregnancy, or immunocompromised due to cancer treatment, smoking, bone marrow or organ

transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications);

- Subject to a medically necessary quarantine or isolation order as a result of COVID-19;

- Advised by a health care provider to self-quarantine due to COVID-19 concerns;

- Experiencing symptoms of COVID-19 and seeking a medical diagnosis; or

- Caring for an identified individual who is subject to a medically necessary quarantine or isolation order as a result of COVID-19 or who has been advised by a health care provider to self-quarantine due to COVID-19 concerns.[41]

55. The Emergency Election Plan leaves untouched the requirement that voters who cast their ballots by mail, other than military and overseas voters, obtain a witness signature for their ballots to count. *See* La. Rev. Stat. § 18:1306(E.)(2)(a). According to the U.S. Census Bureau, over half a million Louisianans live in a single-member household.[42]

56. The Emergency Election Plan also fails to address the failure to provide absentee voters with notice of problems with their mail-in ballots and an opportunity to cure such problems so that their votes may be counted. *See* La. Rev. Stat. § 18:1313.

57. On June 15, 2020, Defendant Secretary of State Ardoin, with the approval of Defendant Attorney General Landry as required by La. Rev. Stat. § 18:18 (A)(3), promulgated an emergency rule that purports to provide an opportunity for voters to be notified of and have an opportunity to cure certain procedural deficiencies in their absentee ballots. *See* ECF No. 40, 40-1. The process requires, however, that the voter appear in person at the office of the registrar, regardless of the deficiency. *See id.*

---

[41] Emergency Election Plan, *supra* note 9, at 8.
[42] Table S2501, *Occupancy Characteristics, Amer. Community Survey 2014-2018*, U.S. Census Bureau, https://data.census.gov/cedsci/table?q=S2501&tid=ACSST5Y2018.S2501&hidePreview=true&g=0400000US22.

**C. The Impact of COVID-19 on Black Louisianans given Past and Present Discrimination**

58.    COVID-19 has devastated Black communities across the country. A recent study showed that counties with disproportionate numbers of Black residents account for more than half of COVID-19 diagnoses and nearly 60 percent of COVID-19 deaths nationally.[43] Socioeconomic factors such as access to health care and employment status, as well as disproportionate rates of underlying health conditions, contribute to the disproportionate impact of COVID-19 on the Black community.[44]

59.    In Louisiana, Black residents have been especially hard-hit by the COVID-19 pandemic. On April 6, Louisiana released racial impact data for COVID-19 deaths: while making up only 33% of the state's population, Black residents accounted for 70% of COVID-19 deaths.[45] And by mid-May, nearly 57% of people who had died from COVID-19 in Louisiana were Black.[46] Put differently, Black Louisianans are dying at a rate 2.65 times higher than other races in the state.[47]

60.    The disparate impact of COVID-19 on Black Louisianans reflects systemic inequality and discrimination in healthcare, education, housing, employment, access to

---

[43] Laura Barron-Lopez, *A new study shows just how badly black Americans have been hit by Covid-19*, Politico, May 5, 2020, https://www.politico.com/news/2020/05/05/black-counties-disproportionately-hit-by-coronavirus-237540.

[44] Vanessa Williams, Disproportionately black counties account for over half of coronavirus cases in the U.S. and nearly 60% of deaths, study finds, Wash. Post., May 6, 2020, https://www.washingtonpost.com/nation/2020/05/06/study-finds-that-disproportionately-black-counties-account-more-than-half-covid-19-cases-us-nearly-60-percent-deaths/; Colleen Walsh, *COVID-19 Targets Communities of Color*, Harvard Gazette, Apr. 14, 2020, https://news.harvard.edu/gazette/story/2020/04/health-care-disparities-in-the-age-of-coronavirus/.

[45] Weekend Edition Sunday, *7 Out Of 10 Patients Killed By COVID-19 In Louisiana Were African American*, NPR, Apr. 12, 2020, https://www.npr.org/2020/04/12/832682489/7-out-of-10-patients-killed-by-covid-19-in-louisiana-were-african-american.

[46] Louisiana Dep't of Health, COVID-19 (last updated May 11, 2020), http://ldh.la.gov/coronavirus/.

[47] *Id.*

transportation, and other socioeconomic factors.[48] Black people are less likely to have health insurance[49] and are disproportionately medically underserved.[50]

61.    Black residents are more likely to suffer and die from the underlying health conditions that make COVID-19 infection more likely and more deadly. On April 8, a CDC study suggested that about 90 percent of the most serious COVID-19 cases involve underlying health conditions that are more common and more deadly in Black Americans and strike at younger ages, including hypertension and cardiovascular disease, obesity, diabetes, and chronic lung disease.[51] According to the CDC, the rate of diabetes is 66 percent higher in Black Americans than in white Americans and the rate of hypertension is 49 percent higher.[52]

62.    The combined effects of discrimination in healthcare, employment, education, housing, and other areas of life create a perfect storm that puts Black Louisianans at disproportionate risk of contracting and dying from COVID-19. Black Americans are, for example, more likely to be part of the essential "front line" workforce than white Americans. In Louisiana, the U.S. Census Bureau's 2018 American Community Survey 1-Year Estimates ("ACS") shows that 29.9% of Black people and just 14.8% of white people over age 16 work in service occupations.[53] Similarly, 16.3% of Black people and just 11.3% of white people work in

---

[48] Sheba Turk, *Racial disparities in Louisiana's COVID-19 death rate reflect systemic problems*, WWLTV, Apr. 7, 2020, https://www.wwltv.com/article/news/health/coronavirus/racial-disparities-in-louisianas-covid-19-death-rate-reflect-systemic-problems/289-bd36c4b1-1bdf-4d07-baad-6c3d207172f2.

[49] Heeju Sohn, *Racial and Ethnic Disparities in Health Insurance Coverage: Dynamics of Gaining and Losing Coverage over the Life-Course* 4-5, Population Research Policy Rev. (April 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5370590/pdf/nihms823497.pdf.

[50] Asad El Malik, *The Color of a Pandemic: COVID-19, Poverty, and Race in New Orleans*, Big Easy Magazine, Mar. 28, 2020, https://www.bigeasymagazine.com/2020/03/28/the-color-of-a-pandemic-covid-19-poverty-and-race-in-new-orleans/; Andre M. Perry, et al. *Mapping racial inequity amid COVID-19 underscores policy discriminations against Black Americans*, Brookings, Apr. 16, 2020, https://www.brookings.edu/blog/the-avenue/2020/04/16/mapping-racial-inequity-amid-the-spread-of-covid-19/.

[51] Linda Villarosa, *'A Terrible Price': The Deadly Racial Disparities of Covid-19 in America*, NY Times, Apr. 29, 2020, https://www.nytimes.com/2020/04/29/magazine/racial-disparities-covid-19.html.

[52] *Id.*

[53] U.S. Census Bureau, *2018: ACS 1-Year Estimates Selected Population Profiles*, Table S0201, https://tinyurl.com/yb3dxcm3.

production, transportation, or material moving occupations.[54] By contrast, 39.3% of white people

versus only 24.7% of Black people in Louisiana hold management or professional occupations—

*i.e.*, "white collar" jobs that are much more likely to allow employees to continue to work safely

at home.[55] Further, because 15.8% of Black households and only 4.7% of white households lack a

vehicle,[56] Black Louisianans are at higher risk of exposure to COVID-19 both at their job and

getting to their job using public transit.

      63.     The CDC has acknowledged that racial and ethnic minorities are disproportionately

impacted by COVID-19 due to economic and social conditions caused by institutional racism and

systemic inequalities in healthcare, among other factors.[57] According to the ACS, in Louisiana,

7.9% of Black people and 6.2% of white people lack health insurance; 39.6% of Black people and

37.8% of white people over age 65 have a disability; 16.0% of Black people and 12.5% of white

people age 18 to 64 have a disability; 19% of Black people and only 10.8% of white people lack a

high school degree; 9.9% of Black people and 4.5% of white people over age 16 are unemployed;

25.2% of Black households and 8.1% of white households in general live below the poverty line;

22.9% of Black people over 65 versus 8.7% of white people over 65 also live in poverty; 31% of

Black households and just 17.9% of white households lack broadband internet; 28.1% of Black

households and 8.7% of white households use SNAP/food stamps; and Black median family

income ($37,048) is half that of white families ($76,800).[58]

---

[54] *Id.*

[55] *See id.*

[56] *Id.*

[57] Centers for Disease Control & Prevention, COVID-19 in Racial and Ethnic Minority Groups, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last visited May 8, 2020).

[58] U.S. Census Bureau, *2018: ACS 1-Year Estimates Selected Population Profiles*, Table S0201, https://tinyurl.com/yb3dxcm3.

64.     And given underlying inequalities, Black people in Louisiana are more likely to have the underlying health conditions that put them at increased risk for contracting and dying from COVID-19. The Louisiana Department of Health reports that Black Louisianans have higher rates of death from diabetes, heart disease, and cancer than white residents.[59] Black adults in Louisiana also report higher rates of asthma than white adults.[60]

**D.  The Challenged Provisions Unreasonably Burden the Voting Rights of Louisiana Voters and Impose an Unconstitutional Condition on the Right to Vote.**

**1.  Louisiana's Excuse Requirement will force thousands of voters to risk exposure to COVID-19 by voting in person during 2020 elections.**

65.     Plaintiffs challenge Louisiana's requirement to have an excuse to vote by mail in upcoming 2020 elections during the COVID-19 pandemic. Even though the emergency plan adds five additional excuses on the COVID-19 emergency application for absentee ballot ("emergency application") for voters who seek to vote by mail in the July primary or August municipal elections, the Excuse Requirement will burden thousands of Louisiana voters who do not qualify for an absentee ballot, but cannot risk voting in person because of the risks of person-to-person contact. Given the current COVID-19 pandemic and its likely resurgence in the fall, the state's failure to provide an option to vote by absentee ballot in November and December in particular for high-risk voters, those caring for or living with high-risk spouses, children, or near relatives, and many others, places these voters in the untenable position of choosing between their vote and their health or the health of a spouse, child, or near relative.

---

[59] Louisiana Dep't of Health, Minority Health Indicators, http://ldh.la.gov/index.cfm/page/672 (last visited May 8, 2020).
[60] *Id.*

66.     By requiring every voter who wishes to safeguard their health—or the health of a spouse, child, or near relative—to have an excuse to vote by mail, Louisiana imposes an undue burden on their fundamental right to vote.

67.     The burden of the Excuse Requirement will fall more heavily on Black voters in Louisiana, who—due to longstanding socioeconomic discrimination and inequity—are more likely to contract and die from COVID-19 than voters of other races.

68.     For the July and August elections, the Excuse Requirement threatens to disenfranchise many thousands of voters, like Plaintiffs Barnett, and LWVLA members, who are living with or caring for loved ones who are at increased risk from COVID-19 and do not want to risk exposing their loved one to infection by voting in person. The Excuse Requirement also poses an unreasonable obstacle to voters like LWVLA members who are between 60-65 years old and whose age makes them more susceptible to COVID-19. And although voters who satisfy one of excuses on the expanded emergency list, like Plaintiff Clark, can vote by absentee ballot in the July and August elections, there is still no option for them to vote by mail in November and December. The burden placed on these voters—including voters who are at severe risk of contracting and suffering complications and dying from COVID-19 is unnecessary. Given epidemiologists and infectious disease specialists, including Dr. Anthony Fauci, are predicting a highly likely resurgence of COVID-19 in the fall and given the inexorable timeline of election administration procedures that must be completed to print mail-in ballots with instructions and to educate the electorate about revised voting procedures, the Excuse Requirement must be enjoined now.

69.     Plaintiffs LWVLA and Plaintiff CCMG will expend their limited resources to educate Louisiana voters about whether they qualify to apply for an absentee ballot and how to

stay safe while voting for those voters who are ineligible for an absentee ballot but need to take specific precautions while voting in person to protect their health or the health of a loved one. Plaintiff CCMG will also spend staff time at selected polling locations to provide hand sanitizer and information on best practices on social distancing to voters who are forced to vote in person but need to stay safe while doing so. These resources are diverted away from Plaintiff LWVLA's and Plaintiff CCMG's regular activities which, for both organizations, include engaging with Louisiana residents on voter registration, the 2020 Census, and the 2020 redistricting cycle.

70.    The Excuse Requirement does not advance any valid government interest. Indeed, the first emergency election plan proposed by Defendant Ardoin allowed broader categories of voters to qualify for an emergency application, including anyone "unable to appear in public due to concern of exposure to or transmission of COVID-19," among other reasons.[61] In defending the first emergency election plan, Defendant Ardoin stated that it was drafted "in direct response to an unprecedented health event" and, noting the state had already reached 1000 deaths, he hoped it would not "take another 600 [deaths] for people to realize it is not wise to proceed with elections as if nothing is wrong."[62]

71.    Further, many other provisions in Louisiana law already safeguard the integrity of the absentee ballot process. For example, the state's election code requires absentee ballot envelopes to include an affidavit and a line for the voter's signature, "certifying that the statements made by [the voter] are true and correct and that the voter is aware of the penalties for knowingly making a false statement therein, which penalties shall be stated on the certificate," *id.* § 18:1306(E.)(1)(f); and permits commissioners, watchers, and qualified voters to challenge an

---

[61] *See supra* ¶ 46.
[62] Recording of Senate Hearing for First Emergency Election Plan, Senate Cmte. on Senate & Governmental Affairs 9:17 to 9:48 (Apr. 15, 2020).

absentee ballot on the grounds that the voter is not qualified to vote in the election or precinct, or that the voter is not the person listed on the precinct register, *id.* § 18:1315(A.)(2)(a); *id.* § 18:565(A.)(1)–(3). Voters are also required to sign the following statement on their absentee ballot request form on penalty of law: "I CERTIFY that the statements made herein by me are true and correct and I may be subject to a fine of not more than $2,000 or imprisonment for not more than 2 years, or both, for knowingly making false statements."[63]

72.    Additionally, given projected voter turnout for the November 2020 election and the highly likely resurgence of COVID-19 in the fall, the Excuse Requirement does not meaningfully advance any valid state interest for the November and December elections. The state has already concluded that the July and August elections need an expanded list of absentee voting excuses for the July and August elections, conceding that these pandemic conditions require a modification of the existing restrictions on voting by mail.

73.    In addition to Louisiana, only 15 other states require an excuse to vote by mail— half of these states have already waived their excuse requirements in response to COVID-19.[64] That demonstrates that such requirements are not necessary to ensure election integrity. And even if the Excuse Requirement created a marginal benefit to a valid state interest, such benefit would be greatly outweighed by the risk of widespread disenfranchisement.

74.    Therefore, in the context of this highly contagious and lethal pandemic, the Excuse Requirement, which requires a significant number of voters to cast their ballots in person in

---

[63] *General Application for Absentee by Mail Ballot*, La. Sec'y of State (Sept. 2019), https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/GeneralApplicationForAbsenteeByMailBallot.pdf; *Disabled Application for Absentee by Mail Ballot*, La. Sec'y of State (Sept. 2019), https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/DisabledApplicationForAbsenteeByMailBallot.pdf.
[64] Max Feldman, et al., Brennan Center for Justice, Covid-19 Should Be a Legitimate 'Excuse' to Vote by Mail (Apr. 20, 2020), https://www.brennancenter.org/our-work/research-reports/covid-19-should-be-legitimate-excuse-vote-mail.

violation of social distancing directives and/or guidelines, violates the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act of 1965 ("VRA"). Additionally, by requiring some voters to cast their ballots in person during this lethal pandemic, the Excuse Requirement also conditions voters' exercise of the franchise on the surrender of their fundamental right to bodily integrity, in violation of the Fourteenth Amendment to the U.S. Constitution.

>  **2. Louisiana's Witness Requirement will deny large numbers of eligible voters the right to vote without meaningfully advancing any valid state interest.**

67.     Plaintiffs also challenge Louisiana's requirement that voters who cast a ballot by mail obtain a witness signature. Under state law, the absentee ballot envelope flap must contain a line for the handwritten signature of one witness and a line for the printed name of the witness. *See* La. Rev. Stat. § 18:1306(E.)(2)(a). The Witness Requirement was amended by SB 75 to require that "no person except the immediate family member of the voter, as defined in this Code, shall witness more than one certificate of a voter." ABSENTEE VOTING, 2020 La. Sess. Law Serv. Act 210. The voter must sign their absentee ballot affidavit in the presence of this witness, who then signs the envelope. *Id.*

75.     In the context of the COVID-19 crisis, the Witness Requirement imposes an unreasonably dangerous and burdensome hurdle to thousands of voters who live alone and, because of their age or underlying health conditions, are strictly limiting person-to-person contact to protect their health. These voters cannot risk contracting COVID-19, and Louisiana cannot require them to do so to vote. Plaintiffs LWVLA and CCMG will expend their limited resources to educate Louisiana voters who live alone but qualify for absentee ballots on how to comply with the Witness Requirement while protecting their own health. Plaintiff CCMG will be spending money on media advertisements to reach voters who live alone and will be voting absentee to

ensure that if they are forced to find a witness, they have the information they need to do so in the safest manner possible. These resources are diverted away from Plaintiff LWVLA's and Plaintiff CCMG's regular activities which, for both organizations, include engaging with Louisiana residents on voter registration, the 2020 Census, and the 2020 redistricting cycle.

68.    On May 1, 2020, Louisiana had over 2.9 million registered voters.[65] In the November 2019 general election, over 1.5 million Louisianans voted.[66] And in the 2016 presidential election, over 2 million Louisiana voters cast ballots.[67]

69.    According to the ACS, 14.9% of Louisiana adults live alone.[68] If the November 2020 election has similar voter turnout to November 2016, nearly 300,000 Louisiana voters (*i.e.*, 14.9% of 2 million voters) could be forced to choose between risking their health by voting in-person, leaving their homes and violating social distancing directives to find witnesses for their absentee ballots, or not voting at all. Many of them will be forced not to vote to protect their health and their community.

70.    This burden on the right to vote will fall more heavily on older voters, voters with disabilities, and Black voters, among others. According to the ACS, of the 532,003 Louisianans of voting age who live alone, 35.89% (190,943) are 65 and older.[69] Around 27.51% of Louisianans 18 and older who live alone have a disability, and 43.69% of Louisianans 65 and older who live alone have a disability.[70]

---

[65] Louisiana Sec'y of State, Registration Statistics – Statewide (last visited May 14, 2020), https://www.sos.la.gov/ElectionsAndVoting/Pages/RegistrationStatisticsStatewide.aspx.
[66] Louisiana Sec'y of State, Geaux Vote, Election Results (select Sat Nov 16 2019 from menu), https://voterportal.sos.la.gov/graphical.
[67] *Id.* (select Tues Nov 6 2018 from menu).
[68] U.S. Census Bureau, *2018: ACS 1-Year Estimates Data Profiles*, Table DP02, https://tinyurl.com/y89tlwwt.
[69] *Id.*
[70] *Id.*

71.     Of all Black households (i.e., homes with all their occupants, regardless of number, treated as one unit), 38.70% contain people who live alone, per the ACS.[71] Of all white households, 31.30% contain people who live alone.[72] And 14.9% of all Black households in Louisiana are headed by women who live alone with their children under 18 (*i.e.*, people who are not legally competent witnesses) versus just 4.9% of similar white households.[73]

72.     The Witness Requirement imposes a severe burden on many voters and is not narrowly tailored to the state's interest in preventing or detecting electoral fraud. The Witness Requirement is simply not an effective enough deterrent or method of detecting and prosecuting fraud to outweigh the severe risks and burdens it imposes on voters, particularly at-risk voters who are living alone, during this pandemic. Indeed, Defendant Secretary of State Ardoin's first Emergency Election Plan waived the Witness Requirement to ensure that it would not prevent voters from casting an absentee ballot without incurring an unreasonable risk to their health or the health of loved ones. Several other provisions of Louisiana law safeguard the integrity of absentee voting without putting voters' lives at risk. In fact, Louisiana is one of only 12 states that require a voter submitting an absentee ballot to have their ballot witnessed or notarized.[74]

73.     SB 75 creates additional burdens to absentee voters who live alone and Organizational Plaintiffs as they work to educate voters on how to comply with the Witness

---

[71] U.S. Census Bureau, *2018: ACS 1-Year Estimates – Public Use Microdata Sample*, Custom Table, https://tinyurl.com/y9xng3b2.
[72] U.S. Census Bureau, *2018: ACS 1-Year Estimates – Public Use Microdata Sample*, Custom Table, https://tinyurl.com/ya7j57b5.
[73] U.S. Census Bureau, *2018: ACS 1-Year Estimates Selected Population Profiles*, Table S0201, https://tinyurl.com/yb3dxcm3.
[74] *See* Ala. Code §§ 17-9-30(b), 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. Ann. § 18:1306(2)(a); Miss. Code Ann. §§ 23-15-627, 23-15-635, 23-15-633; Minn. Stat. §§ 203B.07, 203B.121; Minn. R. 8210.2450; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C. Gen. Stat. § 163-231; Okla. Stat. tit. 26, § 14-108; 17 R.I. Gen. Laws § 17-20-23; S.C. Code Ann. §§ 7-15-220, 7-15-230; VA Code Ann. §§ 24.2-706, 24.2-707; Wis. Stat. § 6.87(4)(b)1.

Requirement. SB 75 decreases the pool of available witnesses, particularly for voters who live alone and away from immediate family members.

74.    In the context of this highly contagious and lethal pandemic, the Witness Requirement imposes an undue burden on the right to vote under the First and Fourteenth Amendments to the U.S. Constitution, unconstitutionally conditions exercise of the right to vote on the surrender of the fundamental right to bodily integrity under the Fourteenth Amendment to the U.S. Constitution, and denies Black voters an equal opportunity to participate in the political process and elect representatives of their choice in violation of Section 2 of the VRA.

> **3.  Louisiana's failure to provide absentee voters notice and an opportunity to cure defects in their absentee ballot request forms and their absentee ballots so they may be counted will disenfranchise Louisiana voters.**

75.    Plaintiffs Clark and LWVLA also challenge Louisiana's failure to provide voters who qualify to vote by absentee ballot any notice of or opportunity to correct deficiencies in their absentee ballot request forms and absentee ballots so that their ballot can be counted.

76.    In the 2016 general election, 3.7% of Louisiana voters received an absentee ballot, and 2.9% of voters returned them.[75] The rejection rate was nearly 3% for absentee ballots in 2016—2,271 voters had their absentee ballots rejected without any notice or opportunity to address deficiencies under Louisiana law.[76]

77.    Louisiana is about to experience a substantially higher level of absentee mail-in voting than prior to the pandemic, for several reasons. For example, elderly voters ages 65 and up already had the option to vote by mail under the existing excuses but now that they are at severe risk from COVID-19, many will abandon in-person voting at the polls and cast ballots by mail for

---

[75] U.S. Election Assistance Comm'n, The Election Administration & Voting Survey: 2016 Comprehensive Report 23 tbl.2 (2016), https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.
[76] *Id.*

the first time. With all these first-time absentee voters requesting ballots and voting them remotely, this will inevitably yield a higher error rate.

78.    Even under the limited expanded eligibility of the Emergency Election Plan, Louisiana officials expect an increase in voters—especially older voters—seeking to vote by mail for the first time in this year's elections. Defendant Secretary of State Ardoin acknowledged this reality in defending the first emergency election plan, noting that even if no plan was implemented, the state was likely to see an influx of absentee ballot requests during the COVID-19 pandemic.[77] Indeed, Plaintiff Clark is a lifelong in-person voter, but must vote by absentee ballot because of the risk in-person voting poses to her health and the health of her family.

79.    Under Louisiana law, local election officials may reject an absentee ballot for a perceived failure to comply with a legal requirement. Without notice of or an opportunity to fix any deficiencies, thousands of voters will be denied their fundamental right to vote and likely more than in prior presidential election years.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(All Plaintiffs)
**Violation of the Fundamental Right to Vote**
**42 U.S.C. § 1983, First and Fourteenth Amendments to the U.S. Constitution**

75.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

76.    Eligible individuals have a fundamental right to vote under the First and Fourteenth Amendments of the U.S. Constitution. Under the First and Fourteenth Amendments, a court considering a challenge to a state election law must carefully balance the character and magnitude

---

[77] Recording of Senate Hearing for First Emergency Election Plan, Senate Cmte. on Senate & Governmental Affairs at 23:45 (Apr. 15, 2020).

of the injury to the rights that the plaintiff seeks to vindicate against the justifications put forward

by the State. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S.

780, 789 (1983).

77.     Unless Plaintiffs are granted the requested relief, thousands of Louisiana voters'

right to vote, including Plaintiffs', will be severely burdened—if not entirely denied—in the July,

August, November, and December elections.

78.     First, Plaintiff Barnett does not qualify to vote by mail under La. Rev. Stat.

§ 18:1303 or the Emergency Election Plan, which requires an excuse to vote by mail. But because

they live with family members who are at increased risk for contracting and suffering severe

complications or dying from COVID-19, they cannot vote in person in the July, August,

November, or December elections without endangering the health of their loved ones. And

Plaintiff Clark, although she qualifies for an absentee ballot under the Emergency Election Plan

for the July and August elections, she does not qualify to vote by mail under La. Rev. Stat

§ 18:1303 for the November or December elections. Because Plaintiff Clark is at increased risk of

severe illness or death from COVID-19, she cannot vote in person without endangering her health.

The Excuse Requirement imposes a severe burden on many voters, including Plaintiffs Barnettand

Clark, which are not sufficiently tailored to the state's interest, and, as such, these laws unduly

burden Plaintiffs' right to vote.

79.     Second, even though many voters qualify to vote by mail in upcoming elections,

the fact that they live alone means that they will have to interact with someone from outside their

household to satisfy the Witness Requirement. Otherwise, their only option is to vote in person.

Due to their age and preexisting health conditions, such contact could result in severe illness or

even death. The Witness Requirement is unreasonably dangerous for absentee voters and imposes

a severe burden on many such voters, including but not limited to those who live alone and/or who have an underlying health condition that puts them at heightened risk. The burdens of the Witness Requirement are not sufficiently tailored to the state's anti-fraud interest, and, as such, these laws unduly burden Plaintiffs' right to vote. The Witness Requirement unduly burdens their right to vote in the July, August, November and/or December elections. Both Plaintiff LWVLA and Plaintiff CCMG are injured by the Witness Requirement, in that they will divert resources and time to educating voters on how to comply safely with the Witness Requirement during the COVID-19 pandemic.

**SECOND CLAIM FOR RELIEF**
**(Plaintiffs Clark and LWVLA)**
**Unconstitutional Condition on Right to Vote Compelling Forfeiture of Right to Bodily Integrity**
**42 U.S.C. § 1983, Fourteenth Amendment to the U.S. Constitution**

80.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

81.     Voting is protected by the First Amendment as a means of political association and political expression. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000); *Norman v. Reed*, 502 U.S. 279, 288–90 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787–89, 806 (1983); *Kusper v. Pontikes*, 414 U.S. 51, 56–58 (1973); *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968).

82.     Under the unconstitutional condition doctrine, the government may not require an individual to forfeit one constitutional right in order to exercise another. *See Lefkowitz v. Cunningham*, 431 U.S. 801 (1977); *Simmons v. United States*, 390 U.S. 377, 394 (1968); *Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005); *Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004); *Green v. Brigano*, 123 F.3d 917, 921 (6th Cir. 1997).

83.     When the government places a condition on the exercise of a right or receipt of a government-created benefit that interferes with a constitutional right, courts will apply the same level of scrutiny to the condition as it would to a law that directly regulates the constitutional right. *See Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250, 261–62 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 335 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969). Government actions that threaten the right to bodily integrity will survive only if they are narrowly tailored to achieve a compelling state interest. *See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998).

84.     The Supreme Court has invalidated voting requirements or conditions that require the forfeiture of another fundamental right. *See Blumstein*, 405 U.S. at 346, 353 (1972) (finding that durational residency requirement for voter registration placed unconstitutional condition on fundamental right to interstate travel).

85.     There is a constitutionally recognized fundamental right to bodily integrity. *See Washington v. Glucksberg*, 521 U.S. 702, 777–78 (1997); *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999). "[I]ndividuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest." *Guertin v. State*, 912 F.3d 907, 919 (6th Cir. 2019) (quoting *Planned Parenthood Sw. Ohio Reg. v. DeWine*, 696 F.3d 490 (6th Cir. 2012)). This right is violated if government officials are deliberately indifferent to the violation of the plaintiff's bodily integrity. *See M.D. by Strukenberg v. Abbot*, 907 F.3d 237, 248 (5th Cir. 2018); *Guertin*, 912 F.3d at 919. "To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety." *M.D. by Stukenberg*, 907 F.3d at 252 (quoting *Hernandez ex rel. Hernandez v. Tex. Dept. of Prot. & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004)). The state "must be both aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and [it] must also draw that inference." *Id.* (quoting *Hernandez*, 380 F.3d 872, at 881) (alteration in original). "Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value . . . is a classic example of invading the core of the bodily integrity protection." *Guertin*, 912 F.3d at 921–22.

86. By requiring Plaintiffs to vote in person or obtain a witness signature, both of which cannot be safely and reasonably accomplished throughout 2020 and during the COVID-19 emergency in Louisiana, Defendants force Plaintiffs to forfeit their right to bodily integrity in order to exercise their right to vote. Should Plaintiffs exercise their right to vote under these circumstances, Defendants will have knowingly and unreasonably subjected Plaintiffs to significant risk of exposure to a highly contagious and highly lethal pathogen, the novel coronavirus that causes COVID-19, without a therapeutic basis or Plaintiffs' consent. As reflected by Defendant Governor Edwards' stay-at-home order, the Emergency Election Plan, and Defendant Secretary of State Ardoin's failed attempts to waive the Witness Requirement for the July and August elections, Defendants are aware of the dangers posed by COVID-19 to voters generally and specifically if voters are forced to comply with the Excuse and Witness Requirements and risk contracting or causing illness, death, and lasting injury.

87. Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of their rights under the Fourteenth Amendment to the U.S. Constitution, by requiring them to forfeit their right to bodily integrity in order to exercise their right to vote.

88. For the foregoing reasons, Defendants have deprived and will continue to deprive Plaintiffs of the right to be free of unconstitutional conditions on their rights to vote in violation of the Fourteenth Amendment to the U.S. Constitution as enforced by 42 U.S.C. § 1983.

### THIRD CLAIM FOR RELIEF
**(Plaintiffs Clark and Barnett)**
**Violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301**

89.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

90.     Section 2 of the VRA provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a).

91.     The "essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Section 2 prohibits both vote denial and vote dilution. *See id.* at 45 n.10.

92.     The Fifth Circuit has adopted a two-part test for determining liability on a claim of vote denial under Section 2:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, [and]
>
> [2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016).

93.     The Excuse Requirement and the Witness Requirement—separately and together— will result in Black voters in Louisiana having less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. The Excuse Requirement and the Witness Requirement will result in the denial or abridgement of the right to vote for Black voters in Louisiana.

94.     The Excuse Requirement and the Witness Requirement—separately and together—impose a discriminatory burden on Black voters in Louisiana.

95.     The Excuse Requirement, if not enjoined, will severely burden the right to vote and will disproportionately impact Black voters in Louisiana. Because of longstanding and pervasive discrimination in healthcare, housing, education, employment, and other socioeconomic areas, Black voters are at higher risk of contracting COVID-19, suffering serious complications and dying than white voters if required to vote in person. Accordingly, Black voters are disproportionately burdened by the Excuse Requirement.

96.     The Witness Requirement, if not enjoined, will severely burden the right to vote and will disproportionately impact Black voters in Louisiana. Black voters are more likely to live alone than white voters in Louisiana. And because of longstanding and pervasive discrimination in healthcare, housing, education, employment, and other socioeconomic areas, Black voters are at higher risk of contracting COVID-19, suffering serious complications and dying than white voters if required to break self-quarantine to find a witness signature on their absentee ballot. Accordingly, Black voters are disproportionately burdened by the Witness Requirement.

97.     The discriminatory results of the Excuse Requirement and the Witness Requirement are directly linked to social and historical conditions. Louisiana has a long history of voting-related discrimination, including recent polling place closures, discriminatory lack of early voting sites and days, and at-large election systems. From 1965 to 2013, Louisiana was covered by the preclearance provisions of the VRA. During that time, the U.S. Department of Justice objected to dozens of Louisiana's proposed voting changes because of their potentially discriminatory purpose or effect.

98.     Black Louisianans continue to face discrimination in other areas of life, including healthcare, health, education, employment, and housing, which hinders their ability to participate effectively in the political process. Such discrimination results in Black Louisianans suffering disproportionately from health conditions that put them at higher-risk of serious complications and death from COVID-19. *See supra* ¶¶ 58-64. This heightened and disproportionate risk from COVID-19 exacerbates the difficulties Louisiana's Black voters face in participating effectively in the political process and electing representatives of their choice.

99.     Under the totality of the circumstances, the Excuse Requirement and the Witness Requirement interact with social and historical conditions to deny and abridge the right to vote of Black people in Louisiana. Because of the Excuse Requirement and the Witness Requirement, Black people in Louisiana will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

### FOURTH CLAIM FOR RELIEF
**(Plaintiffs Clark and LWVLA)**
**Denial of Plaintiffs' Right to Procedural Due Process in Violation of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983**

100.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

101.    The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. A liberty interest that is governed by due process can be created by the Constitution or "may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Courts analyze whether a statutory entitlement existed prior to the notice and process afforded and prior to the deprivation.

102.     "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Fed. Deposit Ins. Corp. v. Bank of Coushatta*, 930 F.2d 1122, 1130 (5th Cir. 1991) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

103.     "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Triplett v. Dep't of Soc. Servs.*, 26 F.3d 1119 (5th Cir. 1994) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)) (internal quotation marks omitted).

104.     Under *Mathews*, the determination of what process is due rests on the balance between (1) the interest affected; (2) the risk of erroneous deprivation under the current procedures, and the "probable value, if any, of additional or substitute procedural safeguards"; and (3) the state's interest, including the "fiscal and administrative burdens" additional procedures would entail. 424 U.S. at 335.

105.     Absent exigent circumstances, due process requires pre-deprivation procedures. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." (*quoting Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original)); *Sciolino*, 480 F.3d at 653 ("An opportunity to clear your name after it has been ruined by dissemination of false, stigmatizing charges is not 'meaningful.'").

106.     Louisiana law gives registered Louisiana voters who meet certain criteria statutory rights to request and cast a mail-in absentee ballot that will be processed and counted, thereby vesting them with liberty interests. Eligible, registered voters enjoy an "individual and personal"

right to vote under Louisiana law. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

107.    Yet Defendants do not afford mail-in absentee voters any notice of or opportunities to cure material defects in their absentee ballot requests and their absentee ballots that will result in rejection, thereby depriving Plaintiff Clark and other registered Louisiana voters eligible to vote by absentee ballot of their liberty interests in requesting and casting mail-in absentee ballots and exercising their fundamental right to vote.

108.    Louisiana is about to experience a substantially higher level of absentee mail-in voting than prior to the pandemic. Many elderly voters ages 65 and up already had the option to vote by mail under the existing excuses but now that they are at severe risk from COVID-19, many will abandon in-person voting at the polls and cast ballots by mail for the first time. With all these first-time absentee voters requesting ballots and voting them remotely, this will inevitably yield a higher error rate.

109.    The risk of erroneous deprivation is high, as these eligible, registered Louisiana voters are entitled by law to vote an absentee ballot either under the provisions set forth under La. Rev. Stat. § 18:1303 or under the Emergency Election Plan and, therefore, must be provided with an opportunity to timely cure any defect that would cause the absentee ballot request form's rejection or the absentee ballot's rejection.

110.    Defendants cannot advance any interests that outweigh the risk of erroneous deprivation. Any increased administrative burden in affording voters an opportunity to cure their absentee ballot defects is far outweighed by the threat of disenfranchising Plaintiff Clark and Plaintiff LWVLA's members eligible to vote by absentee ballot. Defendants' interest in conducting fair election administration and preserving election integrity would not be

compromised in the slightest, and they would satisfy their weighty interest in abiding by federal constitutional requirements.

111.    For the foregoing reasons, Defendants have violated and will continue to violate Plaintiffs' and their members' federal constitutional rights to procedural due process.

112.    At all relevant times, Defendants have acted under color of state law.

113.    Defendants have deprived and will continue to deprive Plaintiffs and their members of their right to adequate notice and a meaningful opportunity to be heard to cure deficiencies with their absentee ballot requests and their absentee ballots. This wholly fails to meet these minimum requirements of procedural due process, as guaranteed to Plaintiffs by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court provide the following relief:

a.    Assume jurisdiction over this action;

b.    Declare that the Excuse Requirement, as provided in La. Rev. Stat. § 18:1303(B) and La. Rev. Stat. § 18:401.3, and the Witness Requirement, as provided in La. Rev. Stat. § 18:1306(E.)(2)(a), violate the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the fundamental right to vote, violate the Fourteenth Amendment to the U.S. Constitution because they unconstitutionally condition the right to vote upon the forfeiture of the right to bodily integrity, and violate Section 2 of the Voting Rights Act, during, at least, all elections in Louisiana in 2020;

c.    Declare that the Cure Prohibition, as found generally in La. Rev. Stat. § 18:1313, violates the Fourteenth Amendment to the U.S. Constitution by denying Plaintiff Clark and Plaintiff LWVLA members their right to procedural due process.

d.    Issue preliminary and permanent injunctions that order relief including:

1.    Prohibiting Defendants from enforcing the Excuse Requirement for all voters during, at least, all elections in Louisiana in 2020;

2.    Prohibiting Defendants from enforcing the Witness Requirement for all voters during, at least, all elections in Louisiana in 2020;[78]

3.    Ordering Defendants to issue guidance instructing all local, city, and parish election officials to modify election materials, including absentee ballots, envelopes, instructions, and other materials, to reflect the enjoining of the Challenged Provisions, and conduct a public information campaign informing Louisiana voters about the enjoining of the Excuse Requirement, the Witness Requirement, and the Cure Prohibition, in coordination with parish and local officials before and during the absentee balloting period;

4.    Ordering Defendants to issue guidance instructing all parish and local election officials to process all valid absentee ballot applications, regardless of whether the applicant has provided an excuse, for all elections in Louisiana in 2020;

5.    Ordering Defendants to issue guidance instructing all parish and local election officials to count otherwise validly cast absentee ballots that are missing the signature of a witness for all elections in Louisiana in 2020;

---

[78] Alternatively, Defendants must offer voters the opportunity to sign a sworn affirmation on the absentee ballot's certificate envelope that states the voter could not reasonably and safely complete the Witness Requirement and count all absentee ballots with that signed, sworn attestation.

6.    Ordering Defendants to provide absentee voters notice and an opportunity to cure any defects in their absentee ballots during, at least, all elections in Louisiana in 2020 that do not require the voter to appear anywhere in person;

e.    Award Plaintiffs attorneys' fees in this action;

f.    Award Plaintiffs their costs of suit;

g.    Order such other relief as the Court deems just and appropriate; and

h.    Retain jurisdiction to enforce the Judgment.

DATED this 17th day of June, 2020.

Respectfully submitted,

/s/ Caren E. Short

Caren E. Short*
Nancy G. Abudu*
SOUTHERN POVERTY LAW CENTER
P.O. Box 1287
Decatur, GA 30031
P: (404) 521-6700
F: (404) 221-5857
caren.short@splcenter.org
nancy.abudu@splcenter.org

Danielle E. Davis, La. Bar No. 37995
SOUTHERN POVERTY LAW CENTER
P.O. Box 57089
New Orleans, LA 70157
T: (504) 486-8982
C: (504) 376-7085
F: (504) 486-8947
danielle.davis@splcenter.org

Jon Sherman* (D.C. Bar No. 998271)
Michelle Kanter Cohen* (D.C. Bar No. 989164)
Cecilia Aguilera* (D.C. Bar No. 1617884)
Fair Elections Center
1825 K St. NW, Ste. 450
Washington, D.C. 20006
P: (202) 331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org

John A. Freedman*
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
P: (202) 942-5000
John.Freedman@arnoldporter.com

*Admitted *pro hac vice*

**Attorneys for Plaintiffs**